Filed 8/21/15  In re A.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E062807 |
| Plaintiff and Respondent, | (Super.Ct.No. J252040) |
| v. | OPINION |
| S.E. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant father.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant mother.

1

Jean-Rene Basle, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

On October 22, 2014, the juvenile court denied defendant and appellant S.E.'s (mother) Welfare and Institutions Code[1] section 388 petition without providing an evidentiary hearing. On January 23, 2015, the juvenile court terminated mother and defendant and appellant L.M.'s (father) (collectively the parents) parental rights as to A.M. (born in 2012). On appeal, mother contends the court erred by denying her section 388 petition and in finding the beneficial parental relationship exception to termination of parental rights inapplicable. Father joins in mother's argument on the latter issue. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

On September 25, 2013, the San Bernardino Children and Family Services (CFS) received an immediate response referral when parents' six-week-old child, H.M. (born August 2013), stopped breathing. Father called the paramedics. Medical personnel were unable to revive her. H.M. had no signs of outward trauma, but X-rays revealed the infant had a broken arm and several fractures at various stages of healing which doctors believed were the result of squeezing. The coroner discovered seven healing rib fractures which he opined occurred between seven and 21 days prior to her death.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

The social worker made a safety plan with mother who was at work at the time of H.M.'s death. The plan allowed C.E. (born April 2004), the children's sibling,[2] and A.M. to stay with their maternal grandmother (MGM) pending further investigation. On October 2, 2013, C.E. and A.M. were brought to the Children's Assessment Center (CAC). Mother brought previous X-rays of A.M.'s leg taken in July 2012. Mother said she was initially informed A.M. had a fracture, but was later told his leg pain was due to a viral infection. Dr. Mark Massi at CAC reviewed the X-rays and said the then five-month-old A.M. had a spiral fracture of his right femur (thigh bone) which Massi believed was the result of abuse.

C.E. had a large red spot in his eye caused by a broken blood vessel. The parents provided no explanation for the injury. Dr. Massi believed the injury was caused by a poke to the eye. C.E. also had scars on his back which were of concern to Dr. Massi. C.E. said the scars were the result of sliding down the wall while doing wall sits as punishment: "Wall sits were described as sitting against the wall with no support of [A.M.'s] buttocks while holding his arms in the air. The parents stated they use this form of punishment as they were advised by a prior social worker not to use corporeal punishment." "According to Dr. Massi, regarding [C.E.], 'A.M. has three (3) notable findings – subconjunctival hemorrhage and two (2) areas of scarring – two (2) of which have no clear explanations.'"

---

[2] C.E.'s father is not the father of either H.M. or A.M. The juvenile court dismissed dependency proceedings as to minor C.E. and entered family law orders placing him with his father, J.J. J.J. is not a party to this appeal.

3

Mother reported that H.M. was born with the umbilical cord wrapped around her neck and she had read on the internet this could cause fractures. "The doctors stated the age of the fractures did not coincide with these injuries happening at birth." Detectives said parents had passed polygraph tests and the detectives did not believe parents were responsible for H.M.'s death. Mother was told she and the children could move back into the family home on November 4, 2013.

At a multidisciplinary team meeting held on November 7, 2013, Drs. Amy Young and Massi of CAC expressed grave concerns minors were back in the family home. Additional findings were made by Dr. Young regarding A.M., including two rib fractures and fractures to the right forearm (radius and ulna). Both doctors believed the injuries to H.M. and A.M. were intentionally inflicted. They said it was not possible for a viral infection to have caused A.M.'s fractures.

At a contested detention hearing on November 14, 2013, the social worker testified parents denied abusing minors. CFS had already placed minors in protective custody. The juvenile court formally detained minors, permitting supervised visitation of once weekly for two hours.

In the December 2, 2013, jurisdictional and dispositional report, the social worker reported mother had provided A.M.'s medical records which reflected no symptoms of abuse. Nonetheless, none of the medical records supported mother's contention a viral infection was responsible for A.M.'s fractures.

The autopsy protocol signed on March 27, 2014, authored by pathologist Dr. Steven Trenkle, left the cause and manner of H.M.'s death undetermined. Dr. Trenkle

4

noted that, "Although this young infant had at least one and possibly more episodes of inflicted trauma leading to bilateral rib fractures which are now healing, as well as a fracture of the left mid humerus which is now healing, no fatal trauma was noted at the autopsy." "The multiple rib fractures may have occurred in one instance or may have occurred over a several day period of time. The infant would have likely been in pain, particularly with the fracture of the left arm . . . ." H.M.'s broken arm was determined to be newer than six weeks, so it could not be medically associated with birth trauma. "Although there is no definite fatal injury, the presence of previous inflicted injuries is quite concerning." The fractures were observable only under microscopic examination.

In the dispositional report dated May 28, 2014, the social worker reported mother had begun participating in services including parenting education, counseling, and a psychological evaluation. Psychologist Dr. Heidi Knipe-Laird opined that mother's "judgment has obviously been questionable at times. [Nevertheless,] [h]er responses showed the potential for emerging insight." Dr. Maurizio Assandri conducted a second psychological evaluation noting there was no data to indicate mother did "not possess the required parenting skills to care for her children. On the other hand, she and her husband have used some questionable disciplinary techniques . . . that might not be appropriate."

Dr. Assandri opined mother "would definitely benefit from services provided by []CFS, such as professional counseling (e.g. individual and family therapy) to help alleviate depressive symptoms and bereavement, some parenting classes and monitoring of her and [her] husband['s] care of A.M., were they reunified with parents. This needs to be seen as a prophylactic measure in light of the serious allegations." Parents engaged

in weekly supervised visitation with A.M. during which they played and interacted appropriately.

The combined, contested jurisdictional and dispositional hearing began on June 2, 2014. Dr. Trenkle testified consistently with his autopsy protocol. He observed "you can get fractures accidentally or nonaccidentally." "The fractures themselves don't tell me. Typically, in accidental injuries there is a history of some traumatic event that occurred that would explain multiple fractures. In this case, there wasn't such a history." "[T]here was no history of a significant traumatic event, so in that case, I thought they were more likely inflicted injuries." "There would have been some pain when the fractures initially occurred." "I think that the fractured arm would have been more painful than typical[] rib fractures." "I would expect a caretaker to know if [a] child had a fractured arm. With rib fractures, that is another story. The caretakers might not notice that."

Dr. Trenkle opined that H.M.'s rib fractures were caused by the squeezing of her chest or the result of a blow or fall. He opined her arm fracture was caused by "[m]aniputlation of the arm or a blow."

Dr. Massi testified he examined A.M. and C.E. at CAC. Dr. Massi reviewed X-rays taken of A.M. on July 18, and 23, 2012. He found a fracture of the right femur. The skeletal survey of A.M. revealed fractures of the right eighth rib, the radius, and ulna. A viral syndrome would not cause a fracture. Dr. Massi suspected physical abuse in the past: "Any fractures in a nonambulatory child without a history of trauma would be concerning for physical abuse." C.E. had a subconjuctival hemorrhage on his eye, scarring on his upper back on both sides, and a curvilinear scar on his side.

6

A friend of mother testified she had observed mother on numerous occasions with the children. She never saw any abuse. Mother was caring and loving with the children. A friend of parents testified the children were well cared for. The social worker testified mother's psychological report reflected mother would benefit from services. Visitation with the parents went well. The parents were participating in services. The social worker recommended denying the parents reunification services due to the severity of injuries sustained by minors with no explanation for how they occurred.

Dr. Karmel Azmy, the pediatrician who treated A.M. four to five times, testified he had diagnosed A.M. with a viral infection on July 18, 2012. Azmy requested an X-ray because mother said she noted he was having pain in his right leg. The radiologist report of the X-ray came back reading, "'Normal, right tibia.'" Azmy did not suspect child abuse. Azmy noted A.M. was "'skeletally immature'" which "means all his ossification centers are not closed . . . ." Azmy asked for a second X-ray and skeletal survey on July 23, 2013, because of an irregularity in the first X-ray. The findings from the skeletal survey were normal; no fractures were found.

Mother testified she never abused the children. She never observed father abuse the children. Parents would have C.E. conduct wall sits as discipline. C.E. asked on one occasion to take his shirt off while doing so. He then said his back hurt. There appeared to be a rug burn on his back. The next day or two, he had light scabbing on his back.

Mother took A.M. to Dr. Azmy because he was not moving his leg. Dr. Azmy told her A.M. had a viral infection. Azmy ordered X-rays and a skeletal survey. The results came back indicating nothing was wrong with A.M.'s leg; he simply had a viral

infection. His leg improved thereafter. Mother believed the injuries to H.M. could have occurred when she fell off the couch when with father or due to her birth with the umbilical cord wrapped around her neck. Mother had completed eight weeks of counseling and had one class left to complete a 12-week parenting class.

Father testified that sometime between September 10, and 12, 2013, H.M. fell off his chest while they were both sleeping on the couch. She fell two feet off the couch onto the carpet. She cried, he held her, she stopped crying, he put her to bed, and she fell asleep.

On September 25, 2013, H.M. was lying face down. He picked her up. She was lifeless and not breathing. He gave her CPR. She threw up milk. He called 911. Paramedics came into the house and began giving her CPR. They took her to the hospital. Father admitted requiring C.E. to do wall sits as discipline. Father admitted a criminal conviction for robbery. He denied having anything to do with the injuries to the children. Father believed H.M.'s injuries were caused when she was born with the umbilical cord wrapped around her neck.

Dr. Charles Hyman testified he had reviewed the record in this case, including the X-rays of A.M. Dr. Hyman noted fractures to A.M.'s femur and eighth rib. Dr. Hyman opined that Dr. Massi had mischaracterized the fracture to A.M.'s femur as a spiral fracture: "I think it better fits to be a longitudinal fracture because a spiral fracture wraps around the bone. This doesn't wrap around the bone here." "This is a very mild type of fracture, nondisplaced. That is why it was hard to be seen. Three doctors and X-rays – they didn't see it initially. It was the family's advocacy to say, 'Something is wrong with

8

my baby's right leg' that kept bringing things to the doctor's attention." With a nondisplaced fracture, "the bones aren't separated. It heals itself."

Dr. Hyman noted that it is the type of fracture which occurs when children utilize walkers. He further observed, "Children with bone fragility or adults with bone fragility – they can be microfractures which progress." Dr. Hyman characterized the rib fracture as not a severe injury. Contrary to Dr. Massi's finding, Dr. Hyman did not see any fracture to the ulna or radius. Dr. Hyman opined the fractures were not the result of abuse.

Dr. Hyman reviewed the X-rays of H.M. He observed only one rib fracture from the X-ray. That injury could have occurred by rolling off a couch. The humeral fracture could have been caused by a fall. Rib fractures can be caused by CPR. The rib fractures noted by Dr. Trenkle were so small most of them did not appear on the X-ray. Dr. Hyman opined the fractures did not cause H.M.'s death.

Regarding the injuries to both minors, Dr. Hyman noted, "They're not high-force injuries. The fact that two siblings had fractures makes me think, somebody involved in bone science, that there is some genetic – some minor genetic association that could be." "Two and a half percent of a normal population will have bone fragility, and they have multiple single-nucleotide polymorphisms, so there's probably hundreds of genetic things that would make bones more fragile from different aspects of the physiology of the bone. So we're not talking about – OI [Osetogeneses Imperfecta] has not been ruled out. I don't think the children have or had OI, but there are certainly other things associated with bone fragility." "The clinical diagnosis of fragile bones in bone science is fracturing

9

with low force regardless of how bones look on plane film or on DEXA evaluation." There is evidence H.M. had fragile bones: "[H.M.] had evidence of increased bone turnover on X-ray and had evidence of diminished mineralization, less-than-ideal mineralization."

Dr. Thomas Grogan, an orthopedic surgeon specializing in children's sports trauma, reviewed the medical records of the children. He observed that A.M. had a spiral fracture which is caused by rotation or torque motion. Dr. Grogan noted that Dr. Trenkle had utilized microscopic analysis of H.M.'s bones when conducting the autopsy in order to observe seven rib fractures. The fractures were not otherwise visible on an X-ray: "[T]hey're microscopic, if that helps. So they're very minimal and certainly not [of] any clinical significance." The fractures would not require treatment. It is not possible the rib fractures were caused by CPR. Dr. Grogan could not opine whether child abuse was a cause of the injuries: When evaluating such cases, "I always think about is it a pattern for abuse, and I don't see that here."

The juvenile court found the allegations true; removed A.M. from parents' custody; denied parents reunification services pursuant to sections 361.5, subdivisions (b)(5), (6), and (12); and scheduled the section 366.26 hearing. Parents filed petitions for extraordinary writ which we denied by opinion on September 26, 2014.

In a section 366.26 report filed September 23, 2014, the social worker recommended the juvenile court terminate parents' parental rights. The social worker noted parents had supervised visits with A.M. once weekly: "The visits have gone well for the parents and the child with the parents interacting appropriately. The parents have

10

consistently been coming to visitation . . . . There have been several sibling visits with [A.M.'s] brother [] at least once a month conducted by the maternal grandmother, . . ."

The court had removed A.M. from mother's custody on November 8, 2013, and placed him with MGM on June 25, 2014. Regarding A.M.'s placement with MGM, the social worker observed A.M. "appears to be generally happy and stable in his current environment. He gives and receives affection readily from his caretaker, . . . They appear to enjoy spending time together. [A.M.] appears to be functioning well, [is] relatively well adjusted, and appears to have benefited from the stability and consistency provided in this home." "The current relative caregiver has stated that she wishes to provide a permanent home for [A.M.] and she is able and willing to do so." "It is clear from [A.M.'s] actions that he views the prospective adoptive parent as his parental figure and [his] adoptive home as [his] own home." "Based on a review of the case and face-to-face contact with the prospective adoptive family, the prospective adoptive parent appears to be a capable caregiver who will be able to provide a stable and permanent home for" A.M.

A.M. "is a[n] appropriate child to be placed for [a]doption due to his young age and the willingness of the prospective adoptive parent to formalize the parental relationship. He is a young child who would benefit from the permanency that [a]doption provides. The relative caregiver/prospective adoptive parent is developing an appropriate parent/child relationship with [the] child []. The relative caregiver/prospective adoptive mother has expressed desire to legalize her relationship with [the] child [] through

11

[a]doption because she loves him, and because she wants to ensure that the child is provided with a safe, stable, and loving environment in which to grow up."

Attached to the report are accounts of visitation between the parents and A.M. occurring nine times between August 8, and October 17, 2014. Father did not visit on August 8, 14, September 19, and October 10, 2014, because he had to work. Father missed a visit on September 5, 2014, with no explanation. Father showed for a visit scheduled on August 22, 2014, but mother and MGM failed to show up so no visitation could occur.

During visits between mother and A.M., they would tell each other they love one another, laugh, appear happy, have fun together, engage in play, act affectionately, and generally have positive interaction without the need for intervention by the visitation coach.

During the four visits occurring in this period in which both parents visited with A.M., it was observed parents greeted A.M. with a smile and immediately engaged in play with him: "The family seemed to enjoy interacting together as observed by their smiles and laughter." A.M. referred to the parents as "mom" and "dad." A.M. "smiled and laughed with both of his parents. At the end of the visit [A.M.] gave his parents a hug and said goodbye to them. [A.M.] seemed hesitant to leave and [mother] asked him why and [A.M.] said he wanted to play more."

On October 8, 2014, mother filed a section 388 petition requesting physical custody, reunification services, unmonitored visitation, or increased visitation. Mother maintained she had visited with A.M. regularly. She alleged as changed circumstances

12

that she had "found a nurturing parenting class . . . where they teach us about the growth and development of children, along with a list of other things, such as feelings of attachment, empathy, nurturing oneself, gentle touch, discipline, expressing feelings, expectations[,] and self worth." Mother reported the program had assessed her on her first and last day in the program and would "give me a print out showing my growth. They are also aware that I will be needing one for [the] Court." She asserted, "These classes are helping me understand how to protect my children from anything ever happening to them again."

Mother was concerned that "[i]f I do not have [a hearing], I . . . will lose the right for placement of my child without the immediate assistance of this court and any right to see my child in the future. I may lose my parental rights and visits and [] placement with my child, if this court does not conduct an evidentiary hearing on these issues. I may be forever foreclosed from seeing my child in the future." She asserted the change was in A.M.'s best interest because she had cared and provided for him from birth, loves him, wants him to be healthy and safe, and she knows that he loves her. A.M. and mother "have a very strong psychological bond and emotional attachment to each other."

On October 15, 2014, the juvenile court issued an order permitting argument on mother's petition insofar as to whether the petition presented a prima facie case for the holding of an evidentiary hearing. On the same date, CFS provided the court with information that MGM "expressed a strong desire to protect [A.M.] and stated 'it's all about [A.M.]' and '[A.M.] is not able to protect himself.'"

13

On October 22, 2014, the court held the ordered hearing on the section 388 petition. The court asked mother's counsel if he would like to argue. Mother's counsel asked if he might call mother to testify. The court responded, "It's an argument for [a] prima facie [case] based on the evidence you submitted [in] the [section] 388 [petition]." Mother's counsel argued mother had visited A.M. regularly. Mother's counsel argued "Mom has benefitted and proven she has learned a lot from her current nurturing class she is taking. She has recognized and grown from these classes to recognize issues that brought [her] . . . here." He asserted the requested change was in A.M.'s best interest because "[t]here is a psychological and emotional bond with her and the minor child. She has always been the mother in [A.M.'s] life, so under [section] 388, I clearly have a prima facie case."

Minor's counsel argued the court should deny the petition without an evidentiary hearing because mother had made no prima facie showing of changed circumstances or that the requested change would be in the best interest of A.M.: "There [are] no attachments to the petition . . . other than Mother's own declaration. Mother stated numerous times that she has made changes, material changes, without really ever referring to what those changes are other than she is enrolled in a parenting program. She completed a parenting program at the time of the juris[diction]/disposition hearing . . . . [¶] The concerns would be, of course, protection issues and acknowledging the abuse and acknowledging the injuries to her children, and that is nowhere to be seen in her declaration. There [are] no counseling reports or anything of that nature."

14

Counsel for CFS argued, "I would join the argument, and I would ask the Court to deny the [section] 388 petition on its face. The mother refers to numerous changes. She keeps saying 'changes' in her [section] 388 [petition]; however, the only change that actually is visible and on the face sheet of the petition, is that she is still attending a nurturing class. There is no certificate showing she is enrolled. There is no certificate showing she has completed the nurturing parenting class, no showing of how her situation has changed, and that is actually what is required by the Code. [¶] All the mother is saying – and she keeps saying, 'I want,' 'I want," 'I want.' 'I want reunification services.' 'I want unsupervised visits.' 'I want custody of my children.' However, she does not show how she has changed, how her circumstances have changed, and how it is in the best interest of [A.M.] to be given any of those things to her. [¶] So there is absolutely no scintilla of evidence supporting the statements the mother is making in her [section] 388 [petition]."

Mother's counsel replied that mother was "entitled to a hearing to show competent evidence." The court indicated it had "reviewed the [section] 388 [petition], along with the attachment or the attached declaration. Court set it for argument on prima facie because Mother did not submit any attachments of perhaps therapists, counseling progress, or parenting, and acknowledgment of the injuries to [the children]. There is nothing here except, quite honestly, her declaration that says that she is in classes. She wants to be a parent. She likes her classes."

The court further noted, "So generally, the declaration is complete hearsay without any attachments or proof that any progress has been made. . . . [¶] In viewing the

15

[section] 388 [petition] on its face, there has been no change of the circumstances. It's the same information that the Court heard when the mother testified, and she was able to tell me these things at the hearing, . . . So the Court finds that the mother has not met her burden under [section] 388 for change of circumstances, or it's not in the best interest of [A.M.] to grant reunification services or placement as she is requesting . . . ." The court denied the petition.

On January 23, 2015, the court held the contested section 366.26 hearing. Father, who was apparently now incarcerated, had been transported to court for the hearing, but declined to participate. The social service practitioner who authored the report dated September 18, 2014, testified visits with the parents went well. However, he recommended adoption because MGM wanted to adopt A.M.

The social worker who supervised visitation between the parents and A.M. for about five months testified she authored the visitation reports. Visits were appropriate. The parents played with A.M. The parents and A.M. were affectionate with each other. A.M. referred to the parents as "mom" and "dad." The parents and A.M. told one another they loved each other. A.M. appeared happy during visits. On one occasion, A.M. did not wish to leave the visit.

Mother testified she maintained regular and consistent visitation with A.M. They play and engage in educational activities during visits. A.M. refers to her as "mom," "mommy," or "momma." A.M. "is always excited when we see him, hugs, kisses. He tells us how much he love[s] us, how much he wants to go home." "He is bonded with us. Not to say that he is not bonded with my mom. She has been in his life his whole life

16

as well. We are still his immediate family, and he still asks to go home with us at the end of a visit."

Mother believed it would be detrimental to A.M. if her parental rights were terminated, "Because my mom's going to take him and leave the state, so it could be the end of any relationship that we have with him, and not only for myself, but for [C.E.] who is – their bond is strong." A.M. "is bonded with us. He still sees us as his parents. He doesn't call my mom 'Mom.' I mean, he is not confused. He know[s] [] his family, and we are his parents. The only thing he is confused is as to why [C.E.] and I go to one place, and he goes somewhere else." Counsel for CFS conceded during argument that mother had engaged in consistent visitation with A.M.

The juvenile court found both the parents had maintained regular visitation. However, the court was "not persuaded that that bond outweighs the benefits of adoption of this minor. The Legislature does prefer adoption, and the parents are required to show that adoption would be detrimental to the minor, and in this case, adoption is not detrimental to the minor. He gains permanency with a family member, which is incredibly important and preferred in that his grandmother wishes to adopt." The court found A.M. adoptable; found termination of the parents' parental rights would not be detrimental to A.M.; and, therefore, terminated parents' parental rights.

DISCUSSION

A. Mother's Section 388 Petition.

Mother contends the juvenile court abused its discretion in denying her a hearing on her section 388 petition. We disagree.

17

"To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.) "Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' [Citation.] The prima facie showing is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.] In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.] The petition must be liberally construed in favor of its sufficiency. [Citations.]" (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.) "Section 388 thus gives the court two choices: (1) summarily deny the petition or (2) hold a hearing. [Citations.]" (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912; contra, *In re G.B.* (2014) 227 Cal.App.4th 1147, 1158, fn. 5 [Allowing argument on whether the mother had made a prima facie case in a section 388 petition "benefitted her by giving her the opportunity to establish a record supporting her request for an evidentiary hearing."].)

"[C]onclusory claims are insufficient to require a hearing. Specific descriptions of the evidence constituting changed circumstances is required. 'Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at a hearing of the change in circumstances or new evidence.' [Citation.]" (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348.) "If a petitioner could get by with general, conclusory allegations, there would be no need for an initial determination by the juvenile court about whether an evidentiary hearing was warranted. In such

18

circumstances, the decision to grant a hearing on a section 388 petition would be nothing more than a pointless formality." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.)

"We review a summary denial of a hearing on a modification petition for abuse of discretion. [Citation.] Under this standard of review, we will not disturb the decision of the trial court unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.) Any error by a juvenile court in denying a hearing on a section 388 petition may be deemed harmless where the petitioner fails to identify any additional evidence the petitioner could have presented at an evidentiary hearing that would have established a right to reunification services. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1161-1165.)

"Once severe abuse has been found, a court is '*prohibited* from granting reunification services "unless it finds that, based on competent testimony, those services are likely to prevent reabuse . . . or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."' [Citation.] Stated another way, in the 'comparatively extreme situation[ ]' when a child is the victim of severe abuse, the legislative presumption is that services are not to be provided to the parent. [Citation.] When this presumption applies, the evidentiary burden is heightened at any hearing to consider a section 388 petition requesting reunification services. In such a case, a juvenile court may modify an order denying reunification services only if there is clear and convincing evidence that the services would be in [A.M.'s] best interests, and only if it makes the same findings that would have been required to offer

19

services at the disposition hearing instead of bypassing services. [Citations.]" (*In re G.B., supra,* 227 Cal.App.4th at pp. 1157-1158 [Mother's willingness to engage in services, separation from the father, and belated psychological evaluation did not establish a prima facie case for relief entitling mother to a hearing on her section 388 petition where she denied any role in the serious physical injuries to the child and denied allowing or ignoring father's abuse.].)

Here, mother did not establish a prima facie case in her petition that her circumstances had changed such that she was entitled to a hearing. Mother declared that she was taking a parenting class which benefited her. However, mother had previously participated in a parenting class, counseling, and two psychological evaluations prior to termination of her reunification services. The taking of another parenting class after the termination of her reunification services was not a changed circumstance. Mother failed to explain why this parenting class was any different than the one she had already completed. Moreover, mother failed to attach any documentation regarding the parenting class. Furthermore, even though mother asserted in her petition that she had requested documentation from the provider which she would present to the court at the hearing, mother failed to do so. Thus, mother failed to establish a prima facie case of changed circumstances.

Although mother also asserted the bond she shared with A.M. made it in his best interest to grant the requested change, mother had already testified to such a bond at the jurisdiction and disposition hearing. Moreover, while mother feared losing her parental rights, cared for A.M., had provided for him, and wanted him to be healthy and safe,

20

these concerns did not demonstrate the requested change was in A.M.'s best interest. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 224 [Mother's contention that by filing a section 388 petition she had nothing to lose and everything to gain could "be said of any similar case. Crediting appellant's theory would give judicial imprimatur to the filing of unmeritorious section 388 petitions. [Citation.]".) The court acted within its discretion in denying mother's section 388 petition.

B. Beneficial Parental Relationship Exception.

Parents contend insufficient evidence supported the juvenile court's determination the beneficial parental relationship exception did not apply to termination of their parental rights. We disagree.

Once reunification services have been terminated and a child has been found adoptable, "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." A beneficial relationship is established if it "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parent has the burden of proving termination would be detrimental to the child. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207.)

"'[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

"[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; accord, *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights . . . . [Citation.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)

Parents failed to carry their burden of proving termination of their parental rights would be detrimental to A.M. Although it is clear A.M. shared a bond with the parents, the record amply demonstrates A.M. shared a bond with MGM as well. When A.M. was first taken into protective custody on September 25, 2013, he was placed with MGM. A.M. was only 19 months old at the time. Mother was apparently told she could move back in with A.M. on November 4, 2013. However, the court formally detained A.M. on November 8, 2013, and placed him with MGM on June 25, 2014. Thus, at the time of the

22

section 366.26 hearing, A.M. had been out of parents' custody for 16 months, almost as long as he had spent in parents' custody.

Additionally, mother testified MGM had been involved with A.M. for his whole life and had a bond with him. A.M. was generally happy and stable in placement with MGM. He was affectionate and enjoyed spending time with her. A.M. was well adjusted and appeared to have benefited from the stability and consistency provided in MGM's home. MGM wished to adopt him and provide him a permanent home. As the juvenile court found, "adoption is not detrimental to the minor. He gains permanency with a family member, which is incredibly important and preferred in that his grandmother wishes to adopt." Therefore, substantial evidence supported the court's determination that termination of parental rights would not be detrimental to A.M.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

HOLLENHORST
Acting P. J.

KING
J.

23